# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                 No. CR 14-0922 JB

GERALD ARCHULETA,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Sentencing Memorandum, filed January 29, 2015 (Doc. 73)("Sentencing Memorandum"); and (ii) the Defendant's Objections to Presentence Report, filed February 6, 2015 (Doc. 74)("Objections"). The Court held sentencing hearings on February 24, 2015, and March 8, 2016. The primary issues are: (i) whether the Court should impose a 4-level aggravated role enhancement under § 3B1.1(a); (ii) whether the Court should impose a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1), because the intended loss exceeded $550,000.00; (iii) whether the Court should impose a 4-level enhancement under § 2B1.1(b)(2)(B), because the offense involved fifty or more victims; (iv) whether the Court should impose a 2-level enhancement pursuant to § 2B1.1(b)(10)(C), because the offense involved sophisticated means; (v) whether the Court should impose a 2-level enhancement under § 2B1.1(b)(11)(C)(i), because the offense involved the use of any means of identification unlawfully to obtain any other means of identification; (vi) whether Defendant Gerald Archuleta's total offense level is correctly calculated as 28, with a criminal history category of III, resulting in a guideline imprisonment range of 97 to 121 months; (vii) whether the Court should impose a special condition requiring Archuleta to undergo a risk

assessment and/or psychosexual evaluation, begin participating in sex offender treatment, and submit to polygraph and any other specific sex offender testing as directed by the Probation Officer; and (viii) whether the recommended restitution of $719,858.73 should be imposed when the Court imposed restitution of $804,753.73 upon co-Defendant Jasonn Gonzales. The Court will overrule Archuleta's objections, and impose a sentence of 71-months imprisonment to be followed by three years of supervised release, and also order that Archuleta pay restitution in the amount of $719,858.73, and a special assessment of $100.00 for each count of conviction, for a total of $500.00 in special assessments.

## FACUTAL BACKGROUND

The Court first addresses Archuleta's Objections to the fact of his offense. The Court then proceeds to make findings of fact in response to those Objections. Next, the Court addresses the applications of the U.S.S.G. to the facts of Archuleta's offense.

### 1. Factual Objections -- Objections 1-8.

The Court addressed Archuleta's factual Objections 1-8 at the February 24, 2015, hearing, and the United States Probation Office ("USPO") subsequently submitted a Third Addendum to the Presentence Report at 1, disclosed April 27, 2015 ("Third Addendum"), in which it stated that it would amend the Presentence Investigation Report, disclosed January 9, 2015 ("PSR"). Third Addendum at 1. The USPO explained:

> In regards to Objections 1 through 8, the Court would like the information in the Offense Conduct Section of the Presentence Report to be amended. Specifically, at the bottom of paragraph 58 to recite as follows: The defendant states he did not obtain fraudulent information regarding other people's identities, provide fictitious information to [Texas Workforce Commission ("TWC")], [Colorado Department of Labor and Employment ("CDLE")], and [New Mexico Department of Workforce Solutions ("NMDWS")] for the purposes of obtaining [Unemployment Insurance ("UI")] benefits. The defendant did not use anyone's identifying information, and did not pay for peoples' food when traveling out of states. Further, the co-defendant received the lion's share of the proceeds.

Third Addendum at 1. In response to the PSR, the Third Addendum, and the Objections, the Court presents its factual findings guiding its decision to overrule the Objections.[1]

**2.      Factual Findings.**

1.      Gonzales and Archuleta acquired personal identifiers from individuals by fraudulent means. See PSR ¶ 74, at 21-22; Amended Plea Agreement ¶¶ 8-9, at 3-8, filed February 26, 2016 (Doc. 97)("Plea Agreement").

2.      Once the victims' information was obtained, as part of the conspiracy, Gonzales created online profiles and applied for unemployment insurance benefits under their individual names. See PSR ¶ 74, at 21-22; Plea Agreement ¶¶ 8-9, at 3-8.

3.      Archuleta would open post office boxes of fraudulent companies, and have employment claims and debit cards submitted to these addresses. See PSR ¶ 74, at 21-22; Plea Agreement ¶¶ 8-9, at 3-8.

4.      Archuleta was personally involved in opening seven post office boxes in New Mexico and Colorado that were used with regard to twenty-two different victims and their names, and in so doing Archuleta he used the victims' personal identifying information. See PSR ¶¶ 16-55, at 6-17; Sworn Affidavit of Postal Inspector Thomas W. Brown at 1-2, filed March 12, 2015 (Exhibit 2(a) in Doc. 78)("Brown Aff."); Spreadsheet Attached to Sworn Affidavit of Postal Inspector Thomas W. Brown at 3, filed March 12, 2015 (Exhibit 2(b) in Doc. 78)("Brown Spreadsheet").

---

[1]At the February 24, 2015, sentencing hearing the Court took the matter under advisement and explained to the parties that it intended to use the record that it had developed so far in this case to make specific factual findings to ensure factual consistency between the co-Defendants being prosecuted and sentenced in this case. These factual findings are the result of that review. See Draft Transcript of Hearing, taken February 24, 2015 ("Feb. Tr."). The Court's citations to Feb. Tr. refer to the court reporters original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

5. Archuleta traveled with Gonzales to obtain the proceeds of the fraudulent UI claims, and also assisted Gonzales in coordinating the opening of post office boxes with his unindicted co-conspirators. <u>See</u> PSR ¶¶ 39-41, at 12-13; Brown Aff. at 1-2.

6. Archuleta exercised management and responsibility over all post office boxes, and over the assets within the mailboxes. <u>See</u> PSR ¶ 56, at 17; Brown Aff. at 1-2.

7. Both Gonzales and Archuleta performed the fraud scheme in three different states: New Mexico, Colorado, and Texas. <u>See</u> PSR ¶ 10, at 4.

8. Archuleta recruited four individuals to join the fraudulent scheme and helped direct their activities: co-conspirators Christina Cardenas, Christine Ortega, Jacob Roybal, and Michelle Espinoza. <u>See</u> Brown Aff. at 1-2; PSR ¶¶ 58-60, at 17.

9. Gonzales and Archuleta approached Cardenas -- Archuleta's half-sister -- and asked if she wanted to open post office boxes in exchange for $50.00 for every post office box she opened. <u>See</u> PSR ¶ 58, at 17-18; Brown Aff. at 1; Report of Interview with Christina Cardenas by Special Agent John Martinez at 1-2 (prepared May 22, 2012), filed February 24, 2015 (Exhibit 2)("Cardenas Interview").

10. "She agreed and was paid $50 per box." PSR ¶ 58, at 17.

11. Cardenas traveled with Gonzales and Archuleta to Texas, Colorado, and New Mexico, and opened a total of twelve post office boxes that were used with regard to the personal identifying information of twenty-two victims. <u>See</u> PSR ¶ 58, at 17; Brown Aff. at 1-2; Brown Spreadsheet at 3.

12. While they traveled to open post office boxes, Archuleta paid for Cardenas' meals and drinks. <u>See</u> PSR ¶ 58, at 17-18; Cardenas Interview at 2.

13. Gonzales and Archuleta similarly approached Ortega, Archuleta's sister, about

opening post office boxes and "her account of the circumstances surrounding her trips to open the boxes was similar to that of Cardenas." PSR ¶ 59, at 18. <u>See</u> Brown Aff. at 1-2.

14.     Gonzales and Archuleta came to her residence, and asked if she wanted to make $50.00 for opening post office boxes. <u>See</u> Brown Aff. at 1-2.

15.     Ortega traveled with Gonzales and Archuleta to Colorado, Texas, and New Mexico, and opened a total of twelve post office boxes that were used with regard to the personal identifying information of twenty-one victims. <u>See</u> Brown Aff. at 1-2; Brown Spreadsheet at 3.

16.     Every time they flew, either Gonzales or Archuleta purchased Ortega's airline tickets, and either Gonzales or Archuleta also purchased all of her meals. <u>See</u> PSR ¶ 58, at 17-18; Report of Interview with Christine Ortega by Special Agent John Martinez at 1-2 (prepared May 22, 2012), filed February 24, 2015 (Exhibit 2)("Ortega Interview").

17.     Gonzales also approached Roybal and his wife, Espinoza. <u>See</u> PSR ¶ 60, at 18; Brown Aff. at 2.

18.     Roybal was acquainted with Gonzales, whom he had met through Archuleta. <u>See</u> PSR ¶ 60, at 18.

19.     Gonzales and Archuleta offered to pay them $1,000.00 each for their names and social security numbers. <u>See</u> PSR ¶ 60, at 18.

20.     Roybal and Espinoza agreed to sell their information, and each received $1,000.00 for doing so. <u>See</u> Report of Interview with Jacob Roybal by Special Agent John Martinez at 2 (prepared May 22, 2012), filed by email February 24, 2015 as Exhibit 2 ("Roybal Interview").

21.     Five to six months later, Gonzales offered to pay Roybal and Espinoza $100.00 to open post office boxes. <u>See</u> Brown Aff. at 2.

22.     They agreed, and Roybal traveled with Gonzales and Archuleta to Colorado and New Mexico, and opened a total of five post office boxes that were used with regard to the personal identifying information of thirteen victims.  See Brown Aff. at 2; Brown Spreadsheet at 3.

23.     When it was not Gonzales giving Roybal and Espinoza money to open the post office boxes, it was Archuleta.  See Roybal Interview at 3.

24.     Archuleta therefore opened seven post office boxes using twenty-two different victim names and personal identifying information, and individuals that he helped recruit -- Cardenas, Ortega, and Roybal -- opened twenty-nine post office boxes that were used with regard to fifty-six victim names and personal identifying information.  See Brown Aff. at 1-2; Brown Spreadsheet at 3.

25.     In total, seventy-eight victim names and personal identifying information were used in connection with post office boxes that Archuleta or individuals he recruited opened.  See Brown Spreadsheet at 3.

26.     Archuleta was able to make large purchases fraudulently using these debit cards with victims' personal information.  See PSR ¶ 74, at 21-22; Plea Agreement ¶ 1, at 3-4.

27.     The total actual loss attributable to Archuleta is $719,858.73, while the total potential or intended loss attributable to Archuleta is $1,265,576.00.  See Brown Aff. at 1-2; Brown Spreadsheet at 3.

## **PROCEDURAL BACKGROUND**

The Indictment, filed March 26, 2014 (Doc. 2), charged Archuleta with the following Counts: (i) Count 1 -- Conspiracy to Commit Mail Fraud in violation of 18 U.S.C. § 1349; (ii) Counts 2 through 5 -- Mail Fraud and Aiding and Abetting in violation of 18 U.S.C. §§ 1341 and

2; and (iii) Count 6 -- Aggravated Identity Theft in violation of 18 U.S.C. § 1028A.  See Indictment ¶¶ 5-36, at 4-11.  On October 24, 2014, Archuleta pled guilty to Counts 1 through 5 of the Indictment.  See Plea Agreement, filed October 24, 2014 (Doc. 58)("First Plea Agreement").  On January 9, 2015, the USPO disclosed the PSR.  See PSR at 1.  The PSR explains that Archuleta pled guilty pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure stipulating to a sentence of 87 to 108 months as well as a limit on restitution to the total principal amount of $734,123.73.  See PSR ¶¶ 5-6, at 3.  Given the Plea Agreement, the PSR also indicates that the Plaintiff United States of America has recommended a 3-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  See PSR ¶ 3, at 3.

The PSR calculates a base offense level of 7 under U.S.S.G. § 2B1.1 and 18 U.S.C. §§ 1341 and 1349, and applies a 16-level increase for losses totaling more than $1,000,000.00 under U.S.S.G. §2B1.1(b)(1)(I); a 4-level increase under U.S.S.G. § 2B1.1(b)(2)(B), because the offenses involved more than 50 victims; a 2-level increase under U.S.S.G. § 2B1.1(b)(10)(C), because Archuleta used sophisticated means to commit the offense; a 2-level increase under U.S.S.G. § 2B1.1(b)(11)(C)(i), because Archuleta's offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; a 4-level increase under U.S.S.G. § 3B1.1(a), because Archuleta was an organizer or leader of a criminal activity involving five or more participants or was otherwise extensive; and a 3-level reduction under U.S.S.G. § 3E1.1(a)-(b), because Archuleta accepted responsibility.  See PSR ¶¶ 70-82, at 21-22.  Regarding Archuleta's criminal history, the PSR calculates a criminal history score of 4, establishing a criminal history category of III under the U.S.S.G.  See PSR ¶¶ 90-91, at 25.  The PSR thus calculates a guideline imprisonment range of 151 to 188 months.  See PSR ¶ 137, at 35.

On February 6, 2015, Archuleta filed Objections to the PSR, making, in total, nineteen specific objections. See Objections at 1. Archuleta's nineteen objections include, essentially, eight factual objections -- causing the Court to address those factual Objections by making its findings of fact -- and eleven legal objections, which regard: (i) the PSR's application of Archuleta's role as an organizing leader under U.S.S.G. §3B1.1(a); (ii) the use of the inchoate, intended loss of $1,256,461.00 to increase the PSR's calculation of the base offense level and the potential application of a reduction for an attempted theft under U.S.S.G. § 2X1.1(b); (iii) the number of fraud victims under U.S.S.G. § 2B1.1; (iv) the PSR's enhancement of 2-levels for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C); (v) the PSR's application of U.S.S.G. § 2B1.1(b)(11)(C)(i); (vi) the PSR's application of a 4-level enhancement for being a leader or organizer of criminal activity; (vii) the PSR's calculation of a total offense level of 32; (viii) the PSR's representation regarding Archuleta's gross monthly income; (ix) the PSR's calculation of the guideline imprisonment range; (x) the PSR's representations in the Nature and Circumstances of the Offense and History and Characteristics of the Defendant regarding the number of victims, allegations that Archuleta obtained fictitious unemployment benefit claims, and Archuleta's role; and (xi) the PSR's recommendation that Archuleta undergo a risk assessment and/or psychosexual evaluation, and begin participating in sex offender treatment. Objections at 6-14.

On February 2, 2015, the USPO disclosed its First Addendum addressing Archuleta's Objections. See Addendum to the Presentence Report, disclosed February 2, 2015 ("First Addendum"). In the First Addendum, the USPO maintains the PSR's factual proffers to which Archuleta had objected and that the Court has now resolved by making its findings of facts to address the factual disagreements. See First Addendum at 1-2. Regarding Archuleta's eleven legal objections, the First Addendum does not change its position in the PSR, except to agree to

amend the PSR's language representing Archuleta's gross monthly income as $2,600.00, to now read $1,300.00. See First Addendum at 4. The USPO disclosed a Second Addendum confirming its positions in the First Addendum after Archuleta formalized his informal Objections. See Second Addendum to the Presentence Report, disclosed February 9, 2015.

The Court held a sentencing hearing on February 24, 2015, but did not sentence Archuleta at that time. See Third Addendum at 1. Instead, the Court continued the sentencing hearing to allow the USPO to address certain issues regarding the PSR and the Objections. See Third Addendum at 1; Order to Set Sentencing Hearing, filed December 14, 2015 (Doc. 87). The USPO subsequently disclosed three additional addendums. In the Third Addendum, the USPO stated that the PSR would be amended. See Third Addendum at 1. The USPO explained:

> In regards to Objections 1 through 8, the Court would like the information in the Offense Conduct Section of the Presentence Report to be amended. Specifically, at the bottom of paragraph 58 to recite as follows: The defendant states he did not obtain fraudulent information regarding other people's identities, provide fictitious information to TWC, CDLE, and NMDWS for the purposes of obtaining UI benefits. The defendant did not use anyone's identifying information, and did not pay for peoples' food when traveling out of states. Further, the co-defendant received the lion's share of the proceeds.

Third Addendum at 1. The Third Addendum also indicated that the USPO would remove the PSR's recommendation that Archuleta be subject to a special sex offender condition. See Third Addendum at 1.

In the Fourth Addendum to the Presentence Report, disclosed January 25, 2016 ("Fourth Addendum"), the USPO provided a guideline update, based on the new amendments in the 2015 Sentencing Guidelines, explaining: "Based on the amended guideline, the defendant's Specific Offense Characteristics were updated to reflect the current enhancements. Therefore, pursuant to USSG §2B1.1(b)(1)(H) the defendant went from a 16-level enhancement to a 14-level enhancement for loss exceeding $550,000 but less than $1,500,000." Fourth Addendum at 1.

The Fourth Addendum provides:

> [P]ursuant to USSG §2B1.1(b)(2)(A)(i), the defendant went from a four-level increase to a two-level increase, as the offense involved more than 10 victims. As such, the current offense level applicable to the defendant is 28. An offense level of 28 and a criminal history category of III establishes a guideline imprisonment range of 97 to 121 months imprisonment. The fine range is $25,000 to $250,000. However, it is noted on October 24, 2014, the defendant pled guilty to an 11(c)(1)(C) plea agreement stipulating to a guideline sentence range of 87 to 108.

Fourth Addendum at 1.

Archuleta then pled to an Amended Plea Agreement, filed February 26, 2016. In the Plea Agreement, Archuleta amends his plea agreement to reflect the 2015 Sentencing Guidelines' lower offense levels under § 2B1.1(b)(1) and (b)(2), and a slightly lower actual loss attributable to Archuleta's conduct, resulting in an amended 11(c)(1)(C) plea agreement stipulating to an amended proposed range of 57 to 71 months and restitution totaling $719,858.73. See Plea Agreement ¶¶ 10-15, at 8-11. Archuleta further waives "the right to appeal [his] conviction(s) and any sentence within 57-71 months, including any fine within the statutory maximum authorized by law, as well as any order of restitution entered by the Court." Plea Agreement ¶ 16, at 11. In the Fifth Addendum, accordingly, the USPO indicated:

> On February 26, 2016, Gerald Archuleta pled guilty to an amended plea agreement to reflect the 2015' Guidelines Manual's lower offense levels under Sections 2B1.1(b)(1) and (b)(2), and a slightly lower actual loss directly attributable to Gerald Archuleta's conduct. The amended plea agreement stipulates to an amended sentencing guideline range of 57 to 71 months. Additionally the defendant's restitution amount has been amended to reflect an amount of $719,858.73 to be paid jointly and severally with his co-defendant.

Fifth Addendum at 1.

The Court ultimately held a sentencing hearing on March 8, 2016, and Archuleta withdrew his "legal objections to actual loss versus intended loss, the number of victims, and sophisticated means." Tr. at 3:12-14 (Hotchkiss). The Court stated on the record its findings of

fact, resolving Archuleta's factual Objections to the PSR, and then proceeded to address the remaining eight legal Objections. See Tr., passim.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The United States Court of Appeals for the Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an

appellate presumption and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[2] Guidelines sentence. See

[2]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . . "). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may

Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v.

---

excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and its Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted). In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).

See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)).  The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings analysis.  See 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively

advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[3] "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth

_____

[3]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

Circuit applies <u>Apprendi v. New Jersey</u>'s requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction."    <u>United States v. Price</u>, 400 F.3d 844, 847 (10th Cir. 2005). <u>Accord</u> <u>United States v. Ray</u>, 704 F.3d at 1314.  A defendant may assert an error under <u>Apprendi v. New Jersey</u> only where the fact at issue increased his sentence beyond the statutory maximum. <u>See</u> <u>United States v. O'Flanagan</u>, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under <u>Apprendi v. New Jersey</u>, because "his sentence does not exceed the statutory maximum"); <u>United States v. Hendrickson</u>, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[4](holding that, after <u>Alleyne v. United States</u>, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  The Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u>, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from <u>Apprendi v. New Jersey</u>, 530 U.S. 466 . . . (2000)(holding that facts

---

[4]<u>United States v. Hendrickson</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Hendrickson</u>, <u>United States v. Schmidt</u>, 353 F. App'x 132 (10th Cir. 2009), <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006), <u>United States v. Schwartz</u>, 408 F. App'x 868 (6th Cir. 2010), <u>United States v. Quinn</u>, 566 F. App'x 659 (10th Cir. 2014), and <u>United States v. Leroy</u>, 298 F. App'x 711 (10th Cir. 2008), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M.

Nov. 3, 2014)(Browning, J.).

## **LAW REGARDING RELEVANT CONDUCT FOR SENTENCING**

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. 1(H). In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

        (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not

charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)   solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)   any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: <u>Witte v. United States</u>, 515 U.S. 389 (1995), and <u>United States v. Watts</u>, 519 U.S. 148 (1997).  In <u>Witte v. United States</u>, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in <u>Witte v. United States</u> had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991 attempt to import marijuana.  <u>See</u> 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  <u>See</u> 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  <u>See</u> 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  <u>See</u> 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  <u>See</u> 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides.  <u>See</u> 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  <u>United States v. Witte</u>, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching

this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including the Tenth Circuit's, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See 519 U.S. at 149.  In reaching its result, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government

establishes that conduct by a preponderance of the evidence. See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis in with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x at 290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In <u>United States v. Coleman</u>, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. <u>See</u> 947 F.2d at 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. <u>See</u> <u>United States v. Coleman</u>, 947 F.2d at 1428-29 (citing <u>United States v. Duncan</u>, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); <u>United States v. Rodriguez</u>, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm. <u>See</u> <u>United States v. Coleman</u>, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. <u>See</u> 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In <u>United States v. Washington</u>, 11 F.3d at 1510, the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. <u>See</u> 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. <u>See</u> 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in <u>United States v. Washington</u> "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 84 (1986)). <u>See</u> <u>United States v. Sangiovanni</u>, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); <u>United States v. Cervantes-Chavez</u>, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has previously held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal. See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.). The Court has also determined that, although it could consider the defendant's silence about information regarding herself or others engaging in criminal conduct, it would not rely on that silence to increase the defendant's sentence. See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 257814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has concluded that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

**RELEVANT LAW REGARING LOSS CALCULATION UNDER U.S.S.G. § 2B1.1**

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G. § 2B1.1. Part of a court's duty when sentencing under § 2B1.1 is to determine whether a defendant's base offense level should be increased because of the amount of loss the offense caused. See U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $5,000, increase the offense level as follows . . . ."). "The court need only make reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C). The Sentencing Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused. United States v. Erpenbeck, 532 F.3d 423, 433 (6th

Cir. 2008)(rejecting a defendant's argument that the entire value of collateral that he pledged for a legitimate loan should be used to off-set his fraudulent transactions and holding that the collateral should be reduced pro-rata based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.SG. § 2B1.1, Application Note 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). "Offense" within the definition of either actual or intended loss refers to a defendant's relevant conduct, as determined by § 1B1.3. See United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction "it does so explicitly" (quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intended for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types"). Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that

would not have occurred <u>but for</u> the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person." <u>Guidelines Handbook</u> § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. <u>See</u> <u>Guidelines Handbook</u> § 14, at 353. The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." <u>United States v. Kieffer</u>, 681 F.3d 1143, 1168 (10th Cir. 2012). Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." <u>United States v. Kieffer</u>, 681 F.3d at 1168 (citing <u>United States v. Peterson</u>, 312 F.3d 1300, 1302 (10th Cir. 2002)). For example, in <u>United States v. Chapman</u>, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a New Mexico Corrections Department facilities manager awarded four million dollars' worth of state government contracts to a developer in exchange for bribes, the United States submitted no evidence regarding the profit, if any, the developer received from the contracts. <u>See</u> 2012 WL 2574814, at *1, 9-10. The Court noted that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1). 2012 WL 2574814, at *10.

The application notes to § 2B1.1 provide that a court shall reduce the loss by certain credits. First, the court shall reduce the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, Application Note 3(E)(i). "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'" United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011)(quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010))(emphasis in United States Snow but not in United States v. James)(internal quotation marks omitted). See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he Guidelines permit a reduction for restoring victims' losses prior to the onset of any government involvement, . . . not . . . when payments are not returned to the victims until after the crime has been discovered by the government and the defendant has . . . motivation to use his ill-gotten gains as leverage . . . ."). The application notes indicate that value returned should be credited against the losses which the victim who received the value suffered, and not against a lump sum of total losses where there are more than one victims: for example, in a case involving a Ponzi or other fraudulent investment scheme, value which one investor receives in excess of that investor's principal investment "shall not be used to offset the loss to another individual investor in the scheme." U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

Second, the court shall reduce the loss, in "a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral," or if the collateral has not been disposed of by sentencing, "the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1, Application Note 3(E)(ii). As the Tenth Circuit has explained, "actual loss should be measured

by the net value, not the gross value, of what was taken when the defendant pledged collateral to secure a fraudulent loan." United States v. Snow, 663 F.3d at 1161. "Where a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan." United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011)(citing United States v. James, 592 F.3d at 1114). Collateral may not be used to offset losses, however, if the defendant "'intended to permanently deprive the creditor of the collateral through concealment.'" United States v. Schild, 269 F.3d 1198, 1201-02 (10th Cir. 2011)(quoting United States v. Nichols, 229 F.3d 975, 979 (10th Cir. 2000)(holding that a defendant convicted of bank fraud may not receive an offset to the loss his offense incurred based on the cattle he pledged as collateral where he sold the cattle, and, thus, the bank could not levy thereon). Additionally, Application Note 3(E)(ii) "cannot reasonably be interpreted as limiting credits to collateral for which the defendant is himself the pledger"; rather, collateral pledged reduces a victim's losses irrespective of which defendant, if there are multiple, pledged the collateral. Guidelines Handbook § 10, at 345 ("The bank suffered only one actual financial loss arising from the concerted action of the two defendants -- a loss objectively measurable by subtracting the value of the collateral from the amount of the loan."). "A court may properly accept a variety of kinds of evidence about the value of the collateral pledged by the defendant, and it need not determine that value to the penny." Guidelines Handbook § 14, at 353.

**LAW REGARDING THE USE OF "SOPHISTICATED MEANS" TO COMMIT FRAUD**

U.S.S.G. § 2B1.1(b)(10)(C) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels. If the resulting offense is less than level 12, increase to level 12." U.S.S.G. § 2B1.1(b)(10)(C). Application Note 8 provides that, "[f]or the purposes of subsection (b)(2), 'sophisticated means' means especially complex or especially intricate offense conduct

pertaining to the execution or concealment of an offense. . . .  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, cmt. n.8(B).

"The possession of false document-making implements may constitute sophisticated means, as may creation of numerous false documents, even if the documents were easily generated and contained only simple falsehoods."  Guidelines Handbook §27, at 390.  The Tenth Circuit first addressed the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[5]  In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld."  52 F.3d at 845.  The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case."  52 F.3d at 849.  The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid."  52 F.3d at 849.  In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric."  United States v. Rice, 52 F.3d at 849.  In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit found that the district court's application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts.  See 199 F.3d at 1158.  The defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, not herself, which are harder to trace, by only depositing a small

_____

[5]The Sentencing Guidelines' enhancement for the use of sophisticated means in the commission of offenses falling under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1.  Compare U.S.S.G § 2B1.1, cmt. n.8(B), with U.S.S.G. § 2T1.1, cmt. n.4.

fraction of her embezzled funds in a bank, which made her embezzlement difficult for the IRS to investigate, and by never withdrawing more than $10,000.00 in one day, which demonstrated that she knew that depositing any more would require the bank to notify the IRS of the deposit, and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

The Tenth Circuit has upheld the application of a sophisticated-means enhancement to a defendant who conducted seminars on avoiding tax liability, and "assisted in the preparation of tax returns that were false and fraudulent as to a material matter."  United States v. Ambort, 405 F.3d 1109, 1113 (10th Cir. 2005).  In United States v. Ambort, the Tenth Circuit found that there was ample evidence in the record to support a sophisticated-means enhancement, because the defendant's program was designed to provide a basis that someone could later articulate as to why they were entitled to the tax status they advanced and included discussions about what information should not be included in tax forms to avoid traceability.  See 405 F.3d at 1120.

In United States v. Snow, the Tenth Circuit held that a district court properly applied an enhancement for the use of sophisticated means under U.S.S.G. § 2B1.1, where the defendant "did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions."  663 F.3d at 1163.  The Tenth Circuit determined that the defendant's fraudulent

scheme was complex, because of the lengths which the defendant took to execute the fraud, and also because the defendant successfully deceived numerous financial institutions and title companies, indicating that he necessarily used sophisticated mean to "fool trained and experienced bank and closing personnel." 663 F.3d at 1163. That the defendant provided, and directed others to provide, fraudulent documentation and information sufficient to deceive the personnel reviewing it, procured and instructed others to procure cashiers' checks to disguise the true source of his income, and circulated and instructed others to circulate funds through different bank accounts to avoid detections indicated that he used sophisticated means. See 663 F.3d at 1163. With these facts, the Tenth Circuit determined that the district court properly applied a sophisticated means enhancement to the defendant's sentence under U.S.S.G § 2B1.1. Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court found that an enhancement for the defendant's use of sophisticated means was warranted where the defendant used offshore accounts and shell companies to evade taxes by hiding the amount of money she earned. See 824 F. Supp. 2d at 1330-34. The Court explained that the application notes to the sentencing guidelines regarding the use of sophisticated means recognizes that the enhancement applies because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner." 824 F. Supp. 2d at 1330-31. Moreover, the Court explained that the case law addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement." 824 F. Supp. 2d at 1332.

Additionally, the United States Court of Appeals for the Sixth Circuit has upheld the imposition of a sophisticated-means enhancement where the defendant created and used fictitious trusts to hide assets from the Internal Revenue Service, even though the defendant was not a sophisticated businessman and no offshore trusts were involved. See United States v. Schwartz, 408 F. App'x 868, 870 (6th Cir. 2010)(unpublished). The United States Court of Appeals for the Seventh Circuit, in United States v. Minneman, 143 F.3d 1274 (7th Cir. 1998), held that the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income. See 143 F.3d at 1283.

### LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Section 3B1.1 of the Sentencing Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

**(a)**    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

**(b)**    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

**(c)**    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Application Note 1.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 Application Note 4. The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)). See United States v. Vigil, 998 F. Supp. 2d 1121, 1155 (D.N.M. 2014)(Browning, J.)(refusing to find that nurse practitioner, who was illegally distributing controlled substances, was a leader or organizer even though she was essential to the success of the drug trafficking scheme). "'A defendant's participation in illegal but lower-level activities,' however, 'will not support application of the enhancement.'" United States v. Vigil, 998 F. Supp. 2d at 1144-45 (quoting United States v. Sallis, 533 F.3d at 1223). Nevertheless, "[a] defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant." United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).

The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also

> identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223.  Neither "a 'role as a supplier of drugs to others, standing alone,'" nor "supplying drugs on credit, or fronting, without more" is not enough to justify a leader enhancement under § 3B1.1.  United States v. Sallis, 533 F.3d at 1223-24 (quoting United States v. Anderson, 189 F.3d at 1212)(citing United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive].'"  United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)).  See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons.  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.").  "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1 Application Note 3.  "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1, Background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct.  "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction.  To qualify as an organizer, however, no control is necessary."  United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)).

The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'" United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)).

## ANALYSIS

The Court will overrule Archuleta's legal Objections, and impose a sentence of 71-months imprisonment to be followed by three years of supervised release, and also order that Archuleta pay restitution in the amount of $719,858.73, and a special assessment of $100.00 for each count of conviction, for a total of $500.00. The Court imposed Archuleta's sentence at the last sentencing hearing. The Court reaches its conclusions stated on the record at the hearing for the reasons that follow.

## I. THE COURT WILL APPLY A 4-LEVEL ENHANCEMENT PURSUANT TO § 3B1.1(a), BECAUSE ARCHULETA WAS THE ORGANIZER OR LEADER OF CRIMINAL ACTIVITY WHICH INVOLVED FIVE OR MORE PARTICIPANTS.

The Court will overrule Archuleta's objection to the PSR's application of a 4-level aggravated role enhancement under § 3B1.1(a). The PSR imposes a 4-level enhancement under § 3B1.1(a), because Archuleta was an organizer or leader of criminal activity which involved five or more participants or was otherwise extensive. Section 3B1.1(a) states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was

otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a). According to Application Note 2, to qualify for an adjustment under this section, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Application Note 2 further explains that "[a]n upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n. 4. The Tenth Circuit has "elaborated that [i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." United States v. Tilga, 824 F. Supp. 2d 1295, 1336-67 (D.N.M. 2011)(Browning, J.)(citing United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)). Applying the factors mentioned in the Sentencing Guidelines, the Court concludes that Archuleta was a leader or organizer in the criminal enterprise and fraudulent scheme.

Regarding Archuleta's role in the scheme, the PSR states:

> Based on the aforementioned information both Gonzales and Archuleta appear to be aggravating role players in the overall scheme. As both individuals worked

collaboratively to devise a scheme to have UI[6] benefits paid out them under false pretenses. The defendant and his co-defendant were equal organizers, and managers of the fraud scheme and they both opened P.O. Boxes across state lines and paid other six unindicted co-conspirators to open P.O. Boxes on their behalf to avoid detection. Gonzales and Archuleta's roles are that of a leader and organizer. Gonzales is responsible for obtaining the identifying information of the victims, coordinating travel for the purpose of obtaining P.O. Boxes, and was also in possession of multiple documents (certification schedules, lists of Chase debit card numbers, charts of various P.O. Boxes and their usage, reports related to owed UI taxes, fraudulent company information, copies of money orders to pay state taxes, claim confirmations, falsified pay stubs, notices of claimants extended benefits, and blank TWC work search logs) located on his computer that were necessary in order to continue the scheme. Archuleta traveled with Gonzales to obtain the proceeds of the fraudulent UI claims, and also assisted Gonzales in coordinating the opening of P.O. Boxes with his unindicted co-conspirators. Archuleta also exercised management and responsibility over all P.O. Boxes and the assets within the mailboxes. Both individuals went to great lengths to avoid detection by working the fraud scheme out of three different states, and therefore their involvement is considered extensive in nature. As such, both Gonzales and Archuleta appear to be aggravating role players.

PSR ¶ 63, at 18-19 (emphasis added).

While the PSR's observation that Gonzales and Archuleta appear to be aggravating role players in the overall scheme, that they were equal organizers and managers, and that their roles are that of leader and organizer, are ultimately legal conclusions, the Court agrees that Archuleta is an organizer or leader of criminal activity in this fraudulent scheme. Archuleta was specifically involved in opening seven post office boxes in New Mexico and Colorado that that were used with regard to twenty-two different victim names and personal identifying information. See PSR ¶¶ 16-55, at 6-17; Brown Aff. at 1-2; Brown Spreadsheet at 3. Individuals whom he helped recruit -- Cardenas, Ortega, and Roybal -- opened twenty-nine post office boxes that were used with regard to fifty-six victim names and personal identifying information. See Brown Aff. at 1-2. Archuleta recruited four individuals to join the fraudulent scheme -- Cardenas, Ortega, Roybal, and Espinoza -- and helped direct their activities. See Brown Aff. at

---

[6]UI stands for unemployment insurance.

1-2; PSR ¶¶ 58-60, at 17.  Gonzales and Archuleta approached Cardenas and asked if she wanted to open post office boxes in exchange for $50.00 for every post office box that she opened.  See PSR ¶ 58, at 17-18; Brown Aff. at 1; Cardenas Interview at 1-2.  "She agreed and was paid $50 per box."  PSR ¶ 58, at 17.  Cardenas traveled with Archuleta and Gonzales to Texas, Colorado, and New Mexico, and opened a total of twelve post office boxes that were used with regard to the personal identifying information of twenty-two victims.  See PSR ¶ 58, at 17; Brown Aff. at 1-2; Brown Spreadsheet at 3.  While they traveled to open post office boxes, Archuleta paid for Cardenas' meals and drinks.  See PSR ¶ 58, at 17-18; Cardenas Interview at 2.

Gonzales and Archuleta similarly approached Ortega about opening post office boxes, and "her account of the circumstances surrounding her trips to open the boxes was similar to that of Cardenas."  PSR ¶ 59, at 18.  See Brown Aff. at 1-2.  Ortega traveled with Archuleta and Gonzales to Colorado, Texas, and New Mexico, and opened a total of twelve post office boxes that were used with regard to the personal identifying information of twenty-one victims.  See Brown Aff. at 1-2; Brown Spreadsheet at 3.  Every time they flew, either Archuleta or Gonzales purchased Ortega's airline tickets, and Archuleta or Gonzales purchased all of her meals.  See PSR ¶ 58, at 17-18; Ortega Interview at 1-2.  Gonzales also approached Roybal and his wife, Espinoza.  See PSR ¶ 60, at 18; Brown Aff. at 2.  Roybal was acquainted with Gonzales, whom he had met through Archuleta.  See PSR ¶ 60, at 18.  Gonzales and Archuleta offered to pay them $1,000.00 each for their names and social security numbers.  See PSR ¶ 60, at 18; Roybal Interview at 1-3.  Roybal and Espinoza agreed to sell their information, and each received $1,000.00 for doing the sale.  See Roybal Interview at 2.  Five to six months later, Gonzales offered to pay Roybal and Espinoza $100.00 to open post office boxes.  See Brown Aff. at 2.  They agreed, and Roybal traveled with Archuleta and Gonzales to Colorado and New Mexico,

and opened a total of five post office boxes that were used with regard to the thirteen victims' personal identifying information.  See Brown Aff. at 2; Brown Spreadsheet at 3.  When it was not Gonzales giving Roybal and Espinoza money to open the post office boxes, it was Archuleta.  See Roybal Interview at 3.

The PSR indicates that, on December 13, 2011, Gonzales, Archuleta, Cardenas, and Ortega flew to Dallas, Texas via Southwest Airlines.  See PSR ¶ 39, at 12.  Gonzales previously booked the flights for all of them.  See PSR ¶ 39, at 12.  On the same date, Cardenas and Ortega opened ten post office boxes in Arlington, Texas -- Cardenas opened five and Ortega opened five.  See PSR ¶ 39, at 12.  On January 12, 2012, Gonzales and Archuleta departed Albuquerque, New Mexico and traveled to Dallas.  See PSR ¶ 40, at 12.  Gonzales made the reservations for both parties.  See PSR ¶ 40, at 12.  They returned on the same date.  See PSR ¶ 40, at 12.  Later, on January 31, 2012, Gonzales and Archuleta traveled to Dallas, where Archuleta used activated debit cards for Brett Cavenaugh, Gary Johnson, Michael Montoya, Matthew Martinez, Juliet Rico, Elio Melara, and Raul Ojada to withdraw $5,300.00 from an ATM.  See PSR ¶ 41, at 12-13.  On the same day, the cards were also used to withdraw $400.00 at the Dallas Love Field Airport in Dallas, and multiple times following Gonzales' and Archuleta's return to Albuquerque.  See PSR ¶ 41, at 12-13.

There is no question that this criminal activity "involved five or more participants or was otherwise extensive . . . ."  U.S.S.G. § 3B1.1(a).  The question is therefore whether Archuleta was an "organizer or leader."  U.S.S.G. § 3B1.1(a).  "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction."  United States v. Wardwell, 591 F.3d 1279, 1304 (10th Cir. 2009).  See United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998)(finding the defendant had a "leadership role" when the

defendant recruited and directed coconspirators). "To qualify as an organizer, however, no control is necessary." United States v. Wardwell, 591 F.3d at 1304. Instead, a defendant may be deemed an organizer under § 3B1.1 for "devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." Valdez-Aroeta, 127 F.3d 1267, 1272 (10th Cir. 1997). See Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)("The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility."). Based on the PSR's factual statements and Archuleta's Plea Agreement, the Court concludes that he was an organizer or leader. He was a leader in that he exercised an element of control over underlings, by recruiting four individuals to join the fraudulent scheme, directing them to open post office boxes, and paying them cash in some instances. He also paid for Cardenas' and Ortega's meals and drinks during their trips to open post office boxes and paid for some of Ortega's airplane tickets. He was specifically involved in opening seven post office boxes in New Mexico and Colorado, see PSR ¶¶ 16-55, at 6-17, and individuals that he recruited opened twenty-nine post office boxes which were used with regard to fifty-six victim names and personal identifying information, see Brown Aff. at 1-2. Archuleta traveled with Gonzales on multiple trips, including one where Cardenas and Ortega opened ten post office boxes in Arlington. See PSR ¶ 39, at 12. He also withdrew $5,300.00 from an ATM using activated debit cards. See PSR ¶ 41, at 12-13. Archuleta's Plea Agreement further supports him being an organizer, in that he

> did knowingly and unlawfully conspire to use the United States Postal Service to mail and receive mail of documents and debit cards in furtherance of a scheme to defraud the New Mexico Department of Workforce Solutions, the Texas Workforce Commission, and the Colorado Department of Labor and Employment of money and property, and to obtain money and property by means of false and fraudulent pretenses, in violation of 18 U.S.C. § 1341.

Plea Agreement ¶ 1, at 3-4. The Court therefore overrules Archuleta's objection to the application of a 4-level aggravated role enhancement under § 3B1.1(a), particularly in light of his role in recruiting four other individuals to join the criminal enterprise.

The Court also rejects Archuleta's argument that "this enhancement substantially overlaps with, and is adequately taken into account by, the loss amount in USSG §2B1.1(b)(1)(H)." Objections at 11. The Court has reviewed the Application Notes for § 3B1.1 and concludes that they do not reflect that the amount of loss has any bearing on the defendant's role under this section. The Court therefore overrules Archuleta' objection to paragraphs 63 and 73 of the PSR, and imposes a 4-level enhancement pursuant to § 3B1.1(a), because Archuleta was the organizer or leader of criminal activity which involved five or more participants. Gonzales also received a 4-level enhancement under § 3B1.1(a) for being an organizer or leader of criminal activity that involved five or more participants. See U.S.S.G. § 3B1.1(a). There, the Court explained:

> Gonzales maintains that this enhancement "substantially overlaps with, and is adequately taken into account by, the loss amount in section 2B1.1[b][1][H]." Sentencing Memorandum at 4. The Court has reviewed the Application Notes for § 3B1.1 and agrees with the USPO that they do "not reflect that the amount of loss has any bearing on the defendant's role under this section." Addendum at 3. Moreover, as with the sophisticated means enhancement, Gonzales conceded at his sentencing hearing that he did not think that anyone could argue that this offense did not involve leading or managing more than five people. See Tr. at 19:19-23 (Pori). As stated above, Gonzales admitted that "enhancements under the facts do apply," see Tr. at 19:17-23 (Pori), but asserted that he thinks that he has "a very good argument when it comes to considering this kind of variance based on substantially overlapping specific offense characteristics," see Tr. at 21:17-20 (Pori). Based on the facts set forth in the PSR, the Court finds by a preponderance of the evidence that Gonzales managed or organized criminal activity that involved five or six people: Archuleta and unindicted individuals, identified as Christina Cardenas, Christine Ortega, Michelle Espinoza, Jacob Roybal, Christina Gonzales, and Charles Diaz. See PSR ¶ 5, at 4. Group crimes are punished more severely, because they create more danger and crimes. The Court will construe Gonzales' argument on this point as a request for a variance,

but concludes that the enhancement is warranted under the Guidelines' plain language. The Court therefore overrules Gonzales' objection to paragraph 73 of the PSR and imposes a 4-level enhancement pursuant to § 3B1.1(a), because Gonzales was the organizer or leader of criminal activity which involved five or more participants.

Memorandum Opinion and Order at 68-69, filed February 16, 2016 (Doc. 90 in <u>United States v. Gonzales</u>)("Gonzales MOO"). The Court likewise concludes that an enhancement is warranted in Archuleta's case based on: (i) his recruitment of four individuals to join the criminal activity and fraudulent scheme; (ii) his involvement in personally opening seven post office boxes and causing to be opened -- through the individuals he recruited -- twenty-nine post office boxes; (iii) that he paid for Cardenas' and Ortega's meals during their trips to open post office boxes; (iv) that he paid for some of Ortega's airplane tickets and provided Roybal with money for opening post office boxes; (v) that he traveled with Gonzales on multiple trips, including one where Cardenas and Ortega opened ten post office boxes in Arlington; and (v) that he withdrew $5,300.00 from an ATM using activated debit cards.

## II.    THE COURT WILL APPLY A 14-LEVEL ENHANCEMENT PURSUANT TO § 2B1.1(b)(1), BECAUSE THE INTENDED LOSS EXCEEDS $550,000.00.

Archuleta objects to the PSR's use of the intended loss amount of $1,356,461.00 rather than the actual loss amount of $734,123.73 to increase his base level offense by 16 levels under § 2B1.1(b)(1). At the February 24, 2015, hearing, however, Archuleta withdrew this objection. <u>See</u> Tr. at 31:10-22 (Court, Hotchkiss)("I have to acknowledge that that is the state of the law, and I will just withdraw that particular objection."). The USPO later submitted a Fourth Addendum, in which it provided a guideline update, based on the new amendments in the 2015 Sentencing Guidelines, explaining: "Based on the amended guideline, the defendant's Specific Offense Characteristics were updated to reflect the current enhancements. Therefore, pursuant to U.S.S.G. § 2B1.1(b)(1)(H) the defendant went from a 16-level enhancement to a 14-level

enhancement for loss exceeding $550,000 but less than $1,500,000." Fourth Addendum to the Presentence Report at 1. The Court agrees with the USPO's analysis and will therefore increase Archuleta's base offense level by 14 levels under § 2B1.1(b)(1)(H).

The USPO grouped Counts 1 through 5 under § 3D1.2(d), and there is no dispute that the guideline for 18 U.S.C. § 1341 and 18 U.S.C. § 1349 is in § 2B1.1 of the Guidelines. There is also no dispute that the base offense level is 7 under § 2B1.1, because "(A) the defendant was convicted of an offense referenced to this guideline." U.S.S.G. § 2B1.1(a)(1). Section 2B1.1(b)(1) sets forth the table establishing by how much a base offense level should be increased depending on the "loss." Here, the intended loss amount is $719,858.73. The 2014 Sentencing Guidelines set forth the following loss table, in pertinent parts:

(1) If the loss exceeded $5,000, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
| --- | --- |
| (A) $5,000 or less | no increase |
| . . . . | |
| (H) More than $400,000 | add **14** |
| (I) More than $1,000,000 | add **16** |
| (J) More than $2,500,000 | add **18** |
| . . . . | |

U.S.S.G. § 2B1.1(b)(1) (2014).

The guidelines were amended in 2015, however, and the loss table set forth in § 2B1.1(b)(1) was modified:

(1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
| --- | --- |

| (A) $6,500 or less | no increase |
| . . . . | |
| (H) More than $550,000 | add **14** |
| (I) More than $1,500,000 | add **16** |
| (J) More than $3,500,000 | add **18** |
| . . . . | |

U.S.S.G. § 2B1.1(b)(1) (2015).

Under the 2014 sentencing guidelines, Archuleta would receive a 16-level enhancement for an intended loss amount of $1,265,576.00 under § 2B1.1(b)(1)(I) because the loss exceeded $1,000,000.00. Under the 2015 sentencing guidelines, however, Archuleta is subject only to a 14-level enhancement under § 2B1.1(b)(1)(H), because the loss amount is more than $550,000.00. Archuleta's actual loss amount is $719,858.73, so even if the Court were to use that figure, Archuleta would still be subject to a 14-level enhancement under § 2B1.1(b)(1)(H).

### III. THE COURT WILL APPLY A 4-LEVEL ENHANCEMENT UNDER § 2B1.1(b)(2)(B), BECAUSE THE OFFENSE INVOLVED FIFTY OR MORE VICTIMS.

The Court will overrule Archuleta's objection to the PSR's application of a 4-level enhancement under § 2B1.1(b)(2)(B), because the offense involved fifty or more victims. <u>See</u> Objections at 8, 12. Under the sentencing guidelines, if an offense involves fifty or more victims, the offense level is increased by 4 levels. <u>See</u> U.S.S.G. § 2B1.1(b)(2)(B). After the February 24, 2015, hearing, the USPO disclosed a Fourth Addendum in light of amendments in the 2015 Sentencing Guidelines. The Fourth Addendum states: "Additionally, pursuant to USSG §2B1.1(b)(2)(A)(i), the defendant went from a four-level increase to a two-level increase, as the offense involved more than 10 victims." Fourth Addendum at 1. In the 2015 Sentencing

Guidelines, § 2B1.1(b)(2)(A)(i) states: "If the offense -- (A)(i) involved 10 or more victims . . . increase by two levels."  U.S.S.G. § 2B1.1(b)(2)(A)(i).

To the extent that Archuleta still objects to this enhancement, the Court overrules the objection and will apply a 2-level enhancement under § 2B1.1(b)(2)(A)(i), because the "offense -- (A)(i) involved 10 or more victims . . . ."  U.S.S.G. § 2B1.1(b)(2)(A)(i).  Archuleta argues that the only victims were those who suffered actual losses: the Texas Workforce Commission, the Colorado Department of Labor and Employment, and the New Mexico Department of Workforce Solutions.  See Objections at 8-9.  The Court agrees with the USPO, however, that this offense involved 10 or more victims.  Application Note 1 to § 2B1.1 defines a "victim" in part as "any person who sustained any part of the actual loss determined under section (b)(1)."  U.S.S.G. § 2B1.1 cmt. n.1.  Application Note 4(E) further defines a "victim" in a case involving "means of identification" as "any individual whose means of identification was used unlawfully or without authority."  U.S.S.G. § 2B1.1 cmt. n. 4(E).

First, this case involves "means of identification."  Application Note 1 to § 2B1.1 states that the phrase "means of identification" "has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e. not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)."  U.S.S.G. § 2B1.1 cmt. n. 1.  18 U.S.C. § 1028(d)(7) in turn defines "means of identification" as "any name or number that may be used, along or in conjunction with any other information, to identify a specific individual, including any . . . name, social security number, date of birth . . . ."  18 U.S.C. § 1028(d)(7).  Here, the PSR states that "Gonzales and Archuleta did fraudulently obtain names, social security numbers, and dates of birth of individuals without such individuals' knowledge."  PSR ¶ 9, at 4.  It further states: "The

investigation has revealed that 61 P.O. Boxes were opened throughout Texas, Colorado, and New Mexico, with approximately 107 victim identities that were fraudulently utilized and connected to 20 fictitious companies (11 in New Mexico, 7 in Colorado, and 2 in Texas)." PSR ¶ 10, at 4. The PSR then details how the fraudulent scheme fraudulently used each victim's identity. See PSR ¶¶ 14-62, at 5-18. In Archuleta's Plea Agreement, he admits that he "knew that, as part of the conspiracy and scheme, Defendant Jasonn Gonzales provided names, dates of birth and social security numbers of the claimed employees to the NMDWS, the TWC and the CDLE without the knowledge or authorization of the claimed employees, who were real persons." Plea Agreement ¶ 3, at 4. Based on these facts, this case involves "means of identification" of "actual (i.e. non fictitious) individuals." U.S.S.G. § 2B1.1 cmt. n. 1.

Second, the Court concludes by a preponderance of the evidence that the offense involved 10 or more "individual[s] whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n. 4(E). Archuleta and Gonzales fraudulently obtained names, social security numbers, and dates of birth of individuals without their knowledge, opened post office boxes across state lines, used these addresses to receive debit cards containing UI benefits, and used these debit cards upon receiving them for their own personal use and benefit. See PSR ¶ 9, at 3. "The investigation has revealed that 61 P.O. Boxes were opened throughout Texas, Colorado, and New Mexico, with approximately 107 victim identities that were fraudulently utilized and connected to 20 fictitious companies (11 in New Mexico, 7 in Colorado, and 2 in Texas)." PSR ¶ 10, at 3. After Archuleta challenged the application of this enhancement at the February 24, 2015, hearing, the United States filed a motion containing a sworn statement from Postal Inspector Thomas W. Brown who conducted this investigation in this case. See Brown Aff. 1-3. Postal Inspector Brown explains:

1. On or about September 12, 2014, I prepared the attached spreadsheet documenting the actual and intended loss amounts defendant Gerald Archuleta is held accountable.

2. These figures were compiled from source data including the New Mexico Department of Workforce Solutions, the Texas Workforce Commission, the Colorado Department of Labor and Employment and various bank and debit card transaction histories.

3. The spreadsheet includes seven (7) Post Office Boxes (PO Boxes) Archuleta opened that included twenty-two (22) different victim names and personal identifying information used to open the PO Boxes.

4. Also included in the spreadsheet are PO Boxes opened by persons Archuleta and Gonzales recruited in order to continue and to advance the Unemployment Insurance (UI) scheme.

5. On May 22, 2012, Department of Labor-Office of the Inspector General Special Agents interviewed Christina Cardenas. Cardenas stated Archuleta is her half-brother. She stated Archuleta and Gonzales approached her and asked if she wanted to open PO Boxes in exchange for $50.00 for every PO Box she opened. She also traveled with Archuleta and Gonzales to Texas, Colorado and New Mexico and opened a total of twelve (12) PO Boxes using the personal identifying information of twenty[-two] (22) victims.

6. On May 22, 2012, Department of Labor-Office of the Inspector General Special Agents interviewed Christine Ortega. Ortega is Cardenas' roommate. Ortega advised Archuleta and Gonzales came to her residence and asked her if she wanted to make $50.00 for opening PO Boxes. She also traveled with them to Colorado, Texas and New Mexico and opened a total of twelve (12) PO Boxes using the personal identifying information of twenty[-one] (21) victims.

7. On May 22, 2012, a United States Postal Inspector and a Special Agent with the Department of Labor-Office of the Inspector General interviewed Jacob Roybal. Roybal advised Archuleta and Gonzales offered him $100.00 to open PO Boxes. Roybal traveled with them to Colorado and New Mexico and opened a total of five (5) PO Boxes using the personal identifying information of thirteen (13) victims.

8. After taking into account the seven (7) PO Boxes Archuleta opened using twenty-two (22) different victim names and personal identifying information, the twenty-nine (29) PO Boxes Cardenas, Ortega and Roybal opened using fifty-six (56) victim names and personal identifying information, I was able to calculate an actual loss amount attributed to Archuleta.

9. Archuleta is responsible for at least $719,858.73 in actual loss. The actual loss attributed to Archuleta is based on the UI payments withdrawn from the issued debit cards. The PO Boxes opened by Archuleta or opened at his direction received UI debit cards. Once that money was withdrawn from those debit cards, it resulted in the above actual loss amount.

10. The spreadsheet I prepared to document Archuleta's restitution amount is attached as Exhibit 1.

Brown Aff. at 1-3. The spreadsheet that Postal Inspector Thomas W. Brown attached to his sworn affidavit provides the Court with the names of the seventy-eight victims whose personal identifying information was used to obtain UI benefits in connection with the post office boxes that Archuleta opened himself or which individuals he recruited opened. See Brown Spreadsheet at 3; Brown Aff. at 1-3. Based on the facts that the PSR, Postal Inspector Brown's Aff., and the attached spreadsheet set forth, the Court concludes by a preponderance of the evidence that the offense involved ten or more individuals whose means of identification -- social security numbers, names, and dates of birth -- were used unlawfully or without authority. See U.S.S.G. § 2B1.1 cmt. n. 4(E). The Court therefore overrules Archuleta's objection to paragraphs 34 and 72 to the extent that he still objects to them, and will apply a 2-level enhancement under § 2B1.1(b)(2)(A)(i) because the "offense -- (A)(i) involved 10 or more victims . . . ." U.S.S.G. § 2B1.1(b)(2)(A)(i).

## IV. ARCHULETA WITHDREW HIS OBJECTION TO A 2-LEVEL ENHANCEMENT FOR USE OF SOPHISTICATED MEANS UNDER § 2B1.1(b)(10)(C).

Archuleta originally objected to the PSR's application of a 2-level enhancement under § 2B1.1(b)(10)(C), because the offense involved sophisticated means. At the February 24, 2015, hearing, however, Archuleta withdrew this objection. See Tr. at 35:23-36:3 (Court, Hotchkiss)("And so I'm a little conflicted myself on this, Your Honor, so I think I should

probably withdraw that objection. I think that given the countervailing aspects of this, sophisticated means through a conspiracy theory is probably easily provable.").

## V. THE COURT WILL IMPOSE A 2-LEVEL ENHANCEMENT UNDER § 2B1.1(b)(11)(C)(i), BECAUSE THE OFFENSE INVOLVED THE USE OF ANY MEANS OF IDENTIFICATION UNLAWFULLY TO OBTAIN ANY OTHER MEANS OF IDENTIFICATION.

The Court will also overrule Archuleta's objection to the PSR's application of a 2-level enhancement under § 2B1.1(b)(11)(C)(i), because "the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from or obtained by the use of, another means of identification . . . ." PSR ¶ 74, at 21-22. The Court agrees with the USPO's analysis why this enhancement applies:

> In this case, the defendant and his co-defendant acquired personal identifiers from individuals by fraudulent means. Once the defendant had the victims' information he was able to create profiles online and apply for UI benefits under their individual names. Additionally, he would open P.O. Boxes of fraudulent companies and have employment claims and debit cards submitted to these addresses. The defendant was able to make large purchases utilizing these debit cards with fraudulently with victim's personal information. As such, the defendant's scheme involved unauthorized transfer, or use of any means of identification to unlawfully produce or obtain any other means of identification or counterfeit access and use of computer hardware and software as a means to create fraudulent identification documents and to produce or obtain any other means of identification. Therefore a two level increase was applied.

PSR ¶ 74, at 21-22.

> Moreover, pursuant to Archuleta's Plea Agreement's Admission of Facts, he
>
> did knowingly and unlawfully conspire to use the United States Postal Service to mail and receive mail of documents and debit cards in furtherance of a scheme to defraud the New Mexico Department of Workforce Solutions, the Texas Workforce Commission, and the Colorado Department of Labor and Employment of money and property, and to obtain money and property by means of false and fraudulent pretenses, in violation of 18 U.S.C. § 1341.

Plea Agreement ¶ 1, at 3-4. The Plea Agreement further states that Archuleta "assisted Co-Defendant Jasonn Gonzales in a scheme that fraudulently registered non-existent companies with the NMDWS, the TWC and the CDLE." Plea Agreement ¶ 2, at 4. Additionally, the Plea Agreement notes that Archuleta "knew that, as part of the conspiracy and scheme, Defendant Jasonn Gonzales provided names, dates of birth and social security numbers of the claimed employees to the NMDWS, the TWC and the CDLE without the knowledge or authorization of the claimed employees, who were real persons." Plea Agreement ¶ 3, at 4. Finally, the Plea Agreement states:

> 5. It was further a part of the conspiracy and scheme to defraud that the Defendants opened, and caused to be opened, Post Office (P.O.) boxes in New Mexico, Texas, and Colorado, which they provided to the three state workforce agencies as the mailing addresses of the claimed employers and employees.
>
> 6. It was a further part of the conspiracy and scheme to defraud that the Defendants caused UI benefit payments to be made to the claimed employees from debit cards, which were then mailed via the United States Postal Service and private commercial interstate carriers to the P.O. boxes that were provided to the three workforce agencies as the claimed employees' mailing addresses.
>
> 7. It was a further part of the conspiracy and scheme to defraud that the Defendants retrieved the debit cards from the P.O. Boxes, and thereafter withdrew the UI benefits at various banks' automatic teller machines (ATMs) in the total amount of approximately $801,848. The amount attributable to P.O. boxes opened by, or caused to be opened by, the Defendant, Gerald Archuleta, was $719,858.73.

Plea Agreement ¶¶ 5-7, at 4-5.

The Court concludes that Archuleta's Plea Agreement's Admission of Facts supports application of the 2-level enhancement under § 2B1.1(b)(11)(C)(i), because the scheme and conspiracy involved the unauthorized transfer or use of various means of identification -- including names, dates of birth and social security numbers -- to file fictitious claims to obtain debit cards. Social security numbers, names, and dates of birth qualify as "means of

identification." <u>United States v. Williams</u>, 355 F.3d 893 (6th Cir. 2003). Further, Application Note 1 to § 2B1.1 requires that, to be counted for purposes of the § 2B1.1(b)(11) enhancement, a false "means of identification" must "be of an actual (i.e. not fictitious individual." U.S.S.G. § 2B1.1 cmt. n.1. Here, the Archuleta Plea Agreement establishes that he knew that, as part of the conspiracy and fraudulent scheme, Gonzales provided the names, dates of birth and social security numbers of *real persons* without their knowledge as claimed employees to the NMDWS, the TWC and the CDLE. <u>See</u> Plea Agreement ¶ 3, at 4. Moreover, in Archuleta's Plea Agreement, he admits that these means of identification were used to file fictitious UI claims to obtain debit cards, which the Defendants then retrieved and withdrew the UI benefits from various ATMs. <u>See</u> Plea Agreement ¶¶ 5-7, at 4-5. The Court has also made a factual finding that Archuleta was directly involved in offering Roybal and Espinoza $1,000.00 each for their names and social security numbers, which they agreed to. <u>See</u> PSR ¶ 60, at 18; Brown Aff. at 2; Roybal Interview at 1-3. The Court therefore overrules Archuleta's objection to the application of this enhancement.[7]

---

[7]Unlike Archuleta, Gonzales also pled guilty to a sixth count of Aggravated Identity Theft in violation of 18 U.S.C. § 1028A. <u>See</u> Indictment ¶¶ 5-36, at 4-11, filed March 26, 2014 (Doc. 2). The USPO originally applied an enhancement pursuant to § 2B1.1(b)(11)(C)(i) in Gonzales' case, but later concluded that it was incorrectly applied. <u>See</u> Memorandum Opinion and Order, filed February 16, 2016 (Doc. 90 in <u>United States v. Gonzales</u>)("Gonzales MOO"). The USPO explained: "Review of the above noted Application note specifically indicates that if a Sentence for Aggravated Identity Theft is imposed in conjunction with a sentence for an underlying offense, the SOC for transfer, possession, or use of a means of identification should not be applied." Gonzales MOO at 23 (citing First Addendum at 2). Here, however, Archuleta did not plead guilty to a count of Aggravated Identity Theft, and § 2B1.1(b)(11)(C)(i) therefore remains applicable.

## VI.    THE USPO HAS CORRECTLY CALCULATED THE GUIDELINES RANGE.[8]

Archuleta agrees he is in criminal history category III, but appears to object to the total offense level of 32.  As the USPO explained in the Fourth Addendum, pursuant to the 2015 Sentencing Guidelines, Archuleta's total offense level has been decreased by four levels to 28.  An offense level of 28 and a criminal history category of III establishes a guidelines imprisonment range of 97 to 121 months imprisonment.  In light of how the Court has ruled on the various enhancements that the PSR recommends, this offense level and guidelines range of 97 to 121 months imprisonment is correctly calculated.  On February 26, 2016, however, Archuleta pled guilty to an Amended Plea Agreement to reflect the 2015 Sentencing Guidelines' lower offense levels under § 2B1.1(b)(1) and (b)(2), and a slightly lower actual loss attributable to Archuleta's conduct.  The amended 11(c)(1)(C) plea agreement stipulates to an amended proposed range of 57 to 71 months.

## VII.   THE COURT WILL NOT IMPOSE A SPECIAL SEX OFFENDER CONDITION.

Archuleta objects to page 2 of Attachment A to the PSR, the USPO's <u>Bruce</u> Memo,[9] which recommends that Archuleta "must undergo a risk assessment and/or psychosocial

---

[8]While Archuleta does not include an objection to PSR ¶ 110 in his Objections, the USPO's First Addendum lists Archuleta's objection 16 as being a request from Archuleta that paragraph 110 be amended to reflect his current monthly gross income.  <u>See</u> Addendum to the Presentence Report at 4 ("First Addendum").  The First Addendum states:

> The defendant requested paragraph 110 of the presentence report be amended to reflect his current gross monthly income.  According to the defendant, his gross monthly income with Santa Fe Discount Tile and Carpet was $2,600 based on a 40-hour work week, as correctly cited at paragraph 110.  However, in preparation for the defendant to serve his sentence, Santa Fe Discount Tile and Carpet has reduced the defendant's work hours to 20 hours per week and his gross monthly income has decreased to $1,300.

First Addendum at 4.  The Court therefore overruled this objection as moot at the February 24, 2015, hearing.

evaluation and begin participating in sex offender treatment, consistent with the recommendation of the assessment and/or evaluation. Furthermore, the defendant must submit to clinical polygraph testing and any other specific sex offender testing as directed by the probation officer." In the Third Addendum to the Presentence Report, however, the USPO amended Attachment A, the Bruce Memo, explaining:

> The United States Probation office has reexamined the recommendation for the special sex offender condition as outlined in page 2 of Attachment A. Upon further review, the United States Probation office believes there is not a sufficient nexus to recommend this special condition due to the prior sex conviction occurring over 23 years ago. Consequently, the United States Probation office will remove the special sex offender condition as outlined in page 2 of Attachment A. This special condition recommended a risk assessment and/or psychosexual evaluation. The amended Attachment A will be submitted to all parties.

Third Addendum at 1. This objection is therefore moot and the Court will overrule the objection as moot.

## VIII. ARCHULETA HAS A BASE OFFENSE LEVEL AND GUIDELINES RANGE HIGHER THAN GONZALES, BUT THE COURT WILL CONSIDER ARCHULETA'S LOWER CULPABILITY IN ITS VARIANCE ANALYSIS.

Finally, Archuleta objects generally to the unfairness of Archuleta receiving a higher sentencing range than Gonzales. See Objections at 13-14. He explains:

> The United States, while stating it was "nearly impossible to determine where each defendant's conduct started and stopped," has assumed Mr. Archuleta's involvement was something other than what it was to deny all of the objections and to then inequitably assert a higher USSG total offense level for Mr. Archuleta than for Mr. Gonzales, despite the United States' claims . . . and a reasonable review of the evidence. The calculation of Mr. Archuleta's offense level as 31

---

[9]In the District of New Mexico, the USPO prepares and delivers a Bruce Memo, named after the United States Court of Appeals for the Tenth Circuit's case of United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006)(Murphy, J.), before sentencing and before violations hearings. The Bruce Memo lists all conditions -- mandatory, standard, and special -- that the Court is thinking of imposing, so the parties know in advance what the Court is considering and can prepare.

with a USSG sentencing range of 151-188 months, both higher than the initiator and orchestrator of the scheme, is simply not right and unfair, and a great overstatement of Mr. Archuleta's criminality in the matter.

Objections at 13-14.

The USPO explained in the Fourth Addendum that, pursuant to the 2015 Sentencing Guidelines, Archuleta's total offense level has been decreased by 4 levels to 28. An offense level of 28 and a criminal history category of III establishes a guidelines imprisonment range of 97 to 121 months imprisonment. Gonzales' total offense level was 30, his criminal history category was II, and his sentencing range was 108 to 131 months on counts one through five. Given that Archuleta's offense level is now 28 -- two points lower than Gonzales' -- and his guidelines range is also less than Gonzales', the Court construes this objection as being moot. To the extent that it is not moot, it is overruled. To the extent it remains alive, the Court concludes that the objection lacks a sound basis in the law; Archuleta's problem is his criminal history and, given that criminal history, his guidelines range is what it is. The USPO has correctly calculated his range. If the Court needs to adjust to reflect Gonzales' greater culpability, it can do so with a variance, rather than, as Archuleta seems to suggest, by incorrectly calculating the guidelines range and thus committing procedural error.

**IT IS ORDERED** that Archuleta's objections to the PSR are overruled. The Court will vary, but not as much as Archuleta requests. The Court sentences Defendant Gerald Archuleta to 71-months imprisonment to be followed by three years of supervised release, and orders that Archuleta pay restitution in the amount of $719,858.73, and a special assessment of $100.00 for each count of conviction, for a total of $500.00.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
    United States Attorney
Tara C. Neda
Stephen R. Kotz
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

*Attorney for the Defendant*